[Cite as *State v. Piccenti*, 2024-Ohio-5821.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 23AP-760 |
| v. | : | (C.P.C. No. 22CR-1944) |
| Adam L. Piccenti, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 12, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Paula M. Sawyers*, for appellee.

**On brief:** *Rancour Scarsella LLC*, and *Paul L. Scarsella*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant, Adam L. Piccenti, appeals from a judgment of conviction entered by the Franklin County Court of Common Pleas.

**I. Facts and Procedural History**

{¶ 2} On May 3, 2022, a Franklin County Grand Jury indicted appellant on two counts of aggravated arson in violation of R.C. 2909.02 and one count of arson in violation of R.C. 2909.03. The indictment alleged appellant set fire to a single-family home in Columbus, Ohio in the early morning hours of May 25, 2021. The fire caused extensive damage to the home. On May 19, 2022, appellant entered a plea of not guilty.

{¶ 3} A jury trial began on October 30, 2023. The parties stipulated American Family Insurance insured the property at issue at the time of the fire. They further

stipulated that as a result of the fire, insurance policyholder Roy Williams received $134,498.20 after filing a claim with American Family Insurance.

{¶ 4}   Plaintiff-appellee, State of Ohio, called as the first witness George Wallace, a fire lieutenant assigned to the Columbus Division of Fire. On May 25, 2021, Lieutenant Wallace was on duty and responded to a house fire at the property. He testified that upon arrival, he observed overhead power lines downed in the home's backyard. Lieutenant Wallace warned the other firefighters of this hazard, and the fire chief summoned the electrical company to disconnect the electric at a nearby electrical pole. Lieutenant Wallace confirmed he understood this to mean the home had electrical utility up and functioning until the time of the fire. Defense counsel declined to cross-examine Lieutenant Wallace.

{¶ 5}   Next, the state called Ernest Fields, appellant's brother, to the stand. Fields testified that in May 2021, he was living in a tent in appellant's driveway while battling a drug addiction. Fields acknowledged he was separately indicted for his role in the arson. Fields pled guilty to the arson count of that indictment on April 28, 2022 and came to an agreement with prosecutors to testify in appellant's trial. Fields told the jury that in May 2021, appellant asked Fields to get in his car, a silver Ford Taurus, and informed him they were going to burn down a house in exchange for $1,000. Appellant told Fields he would receive $100 of that sum to serve as the lookout. When they arrived, appellant parked in an alley a couple blocks from the target property. Fields performed his lookout duties at the property while appellant attempted to ignite the house from outside the back window. Appellant's efforts were unsuccessful, so he and Fields decided to retrieve more gasoline from a gas station. The pair tried again, this time with appellant placing a red gas canister in a large trash can to more inconspicuously transport the gas to the home. Fields, serving as lookout for a second time, detailed how appellant poured gas into the back window of the home and set it alight, after which Fields and appellant ran from the scene back to appellant's car. As they drove by the home, they observed the flames were not high enough to cause the damage they expected. At this point, having twice taken the same path and parked in the same alley with a single car, Fields testified they decided to switch cars and try a third time. On their third attempt, they used appellant's silver Chevrolet Silverado pickup truck and parked in the same alley as before. This time, while Fields again served as lookout, appellant entered the home, doused it with gasoline, and exited before lighting

a pillow aflame and tossing it through the back window. Fields and appellant took off running. Driving by the house once more, they observed the flames were much higher and appeared to engulf the interior of the home. Fields and appellant then left the scene.

{¶ 6} Fields also testified that a couple months later, he attended a drug rehabilitation facility. Appellant paid him a visit to warn Fields he better keep quiet in the event anyone came to ask about the arson job. Nevertheless, Fields claimed he fully complied with fire investigators and prosecutors.

{¶ 7} With Fields on the stand, theff-appellee, State of Ohio, presented video evidence that showed a silver Ford Taurus twice parking in an alley and a silver Chevrolet Silverado parking in that same alley on the night of the crime. The video also showed two men exiting these vehicles and toting gas canisters out of frame in the direction of the property at issue here. Fields testified these cars both belonged to appellant, and that he and appellant were the two men depicted in the videos.

{¶ 8} The state next called Deric Scott to testify. Scott has served in the fire and explosives investigations unit of the Columbus Division of Fire for 8 years, with 23 total years of experience as a firefighter. Scott's primary responsibility in this role is to determine the origin and cause of fires. The trial court declared him an expert in fire investigation without objection from appellant's counsel. In addition to examining the causes of fires, Scott is a certified law enforcement officer trained in the Columbus police academy to "investigate any crimes related to fire." (Tr. Vol. 2 at 183.) Scott was called to the scene around 4:00 a.m. on May 25, 2021, and began his investigation by photographing both the exterior and interior of the damaged home. Taking into account a number of factors, Scott deduced the fire began on the first floor in the southwest room of the home. He observed, for example, the floor in the southwest room was "burned through" to such an extent that "the majority of the floor in that room was missing" and he could not safely enter the room. (Tr. Vol. 2 at 179.) He also noted the wall on the west side of the home was "completely missing both on the first and second floor," whereas the north side of the home had "not really much fire damage at all." (Tr. Vol. 2 at 179; 177.) Scott believed the fire starting in the southwest room was the most likely cause of this distribution of damage. Next, because the home appeared to Scott to be "mostly vacant" due to the "few items left behind," he determined the fire was started intentionally. (Tr. Vol. 2 at 180.) He found "[no] accidental

ignition sources anywhere near the area of origin or outside the home that would lead [him] to believe that it was an accident." (Tr. Vol. 2 at 180.) Scott concluded "there was no way that that amount of damage could happen without there being an ignitable liquid added" to fuel the fire. (Tr. Vol. 2 at 181.) Scott included all his findings in a report. Over objection of appellant's counsel, the trial court permitted the state to admit this report into evidence with redactions to witness statements and interviews.

{¶ 9} Upon further questioning about whether the home was vacant, Scott testified he had no reason to believe anyone was residing in the home at the time of the fire. It appeared to him as if "it had been vacated, maybe even fairly recently. There [were] a few small personal items left behind, but it didn't appear that anybody was actually living there at the time based on there just not being anything really there." (Tr. Vol. 2 at 187-88.) Though Scott found the home had an active electric utility at the time of the fire, he ruled out electrical as a cause. Later on cross-examination, the defense had Scott confirm that vacant properties often have functioning utilities like water and electricity despite their vacancy.

{¶ 10} Furthermore, Scott explained he procured videos from surveillance cameras in the area that captured the alley where appellant and Fields repeatedly parked during their three attempts to burn down the home. Based on still photos taken from these surveillance videos, Scott identified appellant as one of the men transporting gas canisters from the car in the direction of the home. Additionally, Scott discovered a Ford Taurus registered in appellant's name. While he could not similarly link the registration of a Chevrolet Silverado to appellant, Scott confirmed appellant posted a photo on social media depicting the Chevrolet Silverado with "the same license plate that [appellant] had registered to him but for a different car." (Tr. Vol. 2 at 239.) The state obtained a search warrant to seize appellant's Ford Taurus in order to examine its GPS data, but the data extraction attempt was ultimately unsuccessful. The state also received a call from a relative of appellant's ex-girlfriend offering to provide appellant's cell phone to the investigators. The state received the phone and found it maintained the telephone number of RTW Enterprises, LLC as a contact. Scott testified to the fact that Williams, the owner of the burned home, is also the owner of RTW Enterprises, LLC.

{¶ 11} Scott also established that two people were residing in the home as of May 2021 based on a forcible detainer action taken by RTW Enterprises, LLC against two tenants. RTW Enterprises, LLC filed the action to evict these tenants on May 4, 2021 in the Franklin County Municipal Court. On May 21, 2021, the municipal court filed a magistrate's decision that suggested the municipal court take action to evict the tenants from the home for non-payment of rent. On May 24, 2021, the municipal court judge adopted the magistrate's decision.

{¶ 12} Next, the state called Debra Van Fossen to the stand. She served for five years with the state fire marshal as a criminal analyst specializing in investigations involving arson and other fires. She confirmed she was responsible for generating the phone reports that detailed the incoming and outgoing texts and calls on appellant's cell phone. She testified that appellant and Williams texted back and forth on the evening of May 24, 2021, the night appellant started the fire at Williams' property. At 11:33 a.m. the next day, Williams called appellant, and the phone records indicated that call lasted only 15 seconds. Between May 23 and 27, 2021, appellant and Williams called or texted one another 24 times. In the sum total of the subpoenaed records, between January 2 and July 15, 2021, appellant and Williams called or texted one another 697 times. After the defense briefly cross-examined Van Fossen, the state rested its case.

{¶ 13} The defense moved for a judgment of acquittal pursuant to Crim.R. 29, arguing the state failed to present sufficient evidence that appellant was hired to commit arson. The trial court denied the Crim.R. 29 motion. The defense thereafter declined to call any witnesses and rested its case.

{¶ 14} Following deliberations, the jury found appellant guilty of all three charges. The trial court held a sentencing hearing on December 6, 2023 and orally sentenced appellant to an indefinite term of 8 to 12 years in prison, with 36 days of jail-time credit. By judgment entry filed December 21, 2023, the trial court imposed prison terms of 8 to 12 years on Count 1, 8 years on Count 2, and 3 years on Count 3—all to run concurrently for an aggregate term of 8 to 12 years. Appellant timely appealed.

## II. Assignments of Error

{¶ 15} Appellant presents the following four assignment of error for our review:

> [I.] THE TRIAL COURT ERRED AND THEREBY DEPRIVED
> APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED

BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION BY OVERRULING APPELLANT'S CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL, AS THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT A CONVICTION.

[II.] APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THEREBY VIOLATED DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

[III.] THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED A STATE'S WITNESS TO TESTIFY REGARDING HIS INVESTIGATIVE WORK PRODUCT THAT WAS ULTIMATELY ADMITTED INTO EVIDENCE.

[IV.] THE APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL, CONTRARY TO HIS RIGHTS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION.

## III. Analysis

### A. First and Second Assignments of Error

{¶ 16} Appellant's first and second assignments of error are interrelated as they involve sufficiency of the evidence and weight of the evidence, and we therefore address them together. Appellant's first assignment of error asserts the trial court erred in overruling his Crim.R. 29 motion for judgment of acquittal because the evidence was insufficient to support a conviction. Appellant's second assignment of error contends his convictions were against the manifest weight of the evidence.

{¶ 17} Crim.R. 29(A) states:

The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.

" 'Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict.' " *State v. Nichols*, 10th Dist. No. 19AP-113, 2020-Ohio-4362, ¶ 45, quoting *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.*, citing *State v. Flood*, 10th Dist. No. 18AP-206, 2019-Ohio-2524, ¶ 16, citing *Thompkins* at 386. "In reviewing a challenge to the sufficiency of the evidence, an appellate court must determine 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. An appellate court in reviewing the sufficiency of the evidence assumes the verity of the state's evidence and determines whether such evidence satisfies each element of the crime charged. *See Flood*, quoting *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.

{¶ 18} A challenge to the manifest weight of the evidence, on the other hand, "addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386. In reviewing a challenge to the manifest weight of the evidence, an appellate court in essence acts as a "thirteenth juror" and evaluates conflicting evidence. *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). The reviewing court examines " 'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175. Appellate courts owe great deference to the jury's assessment of witness credibility because a jury " ' "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *State v. Huber*, 10th Dist. No. 18AP-668, 2019-Ohio-1862, ¶ 32, quoting *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal*

*Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984); *see State v. Gullick*, 10th Dist. No. 13AP-317, 2014-Ohio-1642, ¶ 11.

{¶ 19} Appellant challenges his convictions for aggravated arson. R.C. 2909.02(A) defines the crime of aggravated arson:

> No person, by means of fire or explosion, shall knowingly do any of the following:
>
> (1) Create a substantial risk of serious physical harm to any person other than the offender;
>
> (2) Cause physical harm to any occupied structure;
>
> (3) Create, through the offer or acceptance of an agreement for hire or other consideration, a substantial risk of physical harm to any occupied structure.

"A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "[T]he definition of knowingly includes the phrase 'regardless of purpose.' Thus, by definition, the State was not required to present any evidence that [the appellant's] purpose was to cause serious physical harm to anyone." *State v. Pfeiffer*, 3d Dist. No. 13-15-22, 2015-Ohio-4312, ¶ 51.

{¶ 20} Here, the evidence was sufficient to support appellant's convictions for aggravated arson, and the convictions were not against the manifest weight of the evidence. Appellant contends the state failed to present enough evidence showing he knowingly set fire to an occupied structure. As with the jury's verdict, a rational trier of fact could undoubtedly find the state proved beyond a reasonable doubt that appellant knowingly set the fire at issue here. His brother, Fields, testified that appellant asked him to assist in setting a house on fire in exchange for $1,000. Fields recounted in great detail appellant's three attempts to set the house ablaze. Fields described appellant pouring gasoline into the house through a window, but when that failed, he testified appellant entered the house, doused it with gasoline, exited, and threw a flaming pillow inside through the window. Apparently, the jury evaluated Fields' testimony and deemed it credible, and this court "afford[s] great deference to the trial court's determination of witness credibility." *Huber* at ¶ 38. In addition, Scott reported the fire damage in the home was consistent with Fields'

testimony—the fire began in the southwest room of the house and was fueled by a fire accelerant. Further imperiling appellant's defense that he did not act knowingly, the state did not rely solely on witness testimony. The state presented the jury with video evidence of two men, credibly identified as appellant and Fields, thrice parking in the very alley Fields described and hauling canisters of gasoline in the direction of the now-burned home. Appellant also argued there was insufficient evidence of an agreement for hire. Fields testified, however, appellant informed him the arrangement was to burn down the house in exchange for $1,000. Furthermore, phone records revealed appellant was in frequent contact with Williams, including calls and text messages that took place just before and after the arson. Williams was the owner of the rental property who promptly sought and received an insurance payout of more than $130,000 as compensation for the fire damage. It is thus evident that a reasonable jury examining all this evidence would conclude appellant knowingly set fire to this house, and did so knowing he had engaged in an "agreement for hire." R.C. 2909.02(A)(3).

{¶ 21} Appellant further claimed the home was not an "occupied structure." R.C. 2909.02(A)(2) and (3). "[O]ccupied structure," as that phrase is used in the aggravated arson statute, is defined in relevant part as "any house * * * or any portion thereof" that "is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present." R.C. 2909.01(C)(1). We have previously held "a structure which is dedicated and intended for residential use, and which is not presently occupied as a person's habitation, but, which has neither been permanently abandoned nor vacant for a prolonged period of time, can be regarded as a structure 'maintained' as a dwelling." *State v. Green*, 18 Ohio App.3d 69, 72 (10th Dist.1984). In *Green*, this court put forth "a residential rental unit which is temporarily vacant" as an example of this type of dwelling because, "even though the dwelling is not being presently occupied as a place of habitation, that situation is temporary, and persons are likely to be present from time to time to look after the property—to help 'maintain' its character as a dwelling." *Id*. The Supreme Court of Ohio has similarly found "the definition of 'occupied' in the Revised Code is far broader than in ordinary usage," so that " '[e]ven homes undergoing major renovations have been found to be occupied structures.' " *State v. Whitaker*, 169 Ohio St.3d 647, 2022-Ohio-2840, ¶ 62, quoting *State*

*v. Johnson*, 188 Ohio App.3d 438, 2010-Ohio-3345, ¶ 18 (2d Dist.). The court in *Whitaker*, in considering what it took for a structure to be "occupied," took into consideration the length of time since "the house was last occupied." *Id.* at ¶ 63. It eventually concluded the house was not an occupied structure under R.C. 2909.01(C)(1) because "it had been a prolonged period since the house had been occupied and * * * it would remain unoccupied indefinitely." *Id.* Other courts have similarly interpreted the definition of "occupied structure" in R.C. 2909.01(C)(1). *E.g.*, *State v. Calderwood*, 194 Ohio App.3d 438, 2011-Ohio-2913, ¶ 15-16 ("Here, although no one had been living in the house, the house was not abandoned. The evidence showed the house maintained its residential purpose even though it was vacant."); *State v. Williams*, 8th Dist. No. 92668, 2009-Ohio-6826, ¶ 15 ("[A]lthough no one had been living in the house for over four months, the house was not abandoned. Despite its vacancy, it still had a residential purpose."); *State v. Wooten*, 5th Dist. No. 484, 1994 Ohio App. LEXIS 2885, *10-11 (June 10, 1994) ("While there was evidence that [the] appellant removed his belongings from the trailer shortly before the fire, this does not require a conclusion that the trailer was permanently abandoned or vacant for a prolonged period of time."); *State v. Craig*, 5th Dist. No. 14-CA-19, 2015-Ohio-541, ¶ 37 ("[A] reasonable person could have formed a firm belief or conviction that [the property] was maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied."); *State v. Patterson*, 7th Dist. No. 15 NO. 426, 2015-Ohio-5456, ¶ 27 ("And even though no one was inside the trailer at the time of the fire, the trailer was 'occupied' within the meaning of the statute."); and *State v. Steen*, 2d Dist. No. 2019-CA-16, 2020-Ohio-4598, ¶ 32-33.

{¶ 22} In the present case, a forcible detainer action indicated the property was potentially occupied until the very last days, if not *the* last day, before appellant set the house on fire. On May 24, 2021, the municipal court adopted a magistrate's order requiring the tenants to vacate the property. In the early morning hours of May 25, 2021, appellant set the house on fire. Although Scott testified the house appeared vacant because it largely lacked furniture and other personal property, vacancy alone is not enough to render the house unoccupied under R.C. 2909.01(C). This was a rental property from which the tenants had been officially evicted less than one full day before the arson. As noted above, so long as the property maintained a residential purpose, it would not be considered

abandoned even if no one was currently living there. Rental properties often have gaps between the end of one tenant's term and the beginning of the next. Regardless of renters' moving schedules, the definition of "occupied structure" in the aggravated arson statute remains the same. For example, one court determined a property that had been vacant for four months was not abandoned because it retained its residential purpose based on the simple fact that "it was owned by an out-of-state entity that was selling the property as a residential dwelling." *Williams* at ¶ 15. Here, the house appellant burned down was vacant anywhere from one to five days. There was no indication the home suddenly lost its status as a residential rental property. Such a property does not shed its residential purpose the instant a tenant departs, and so we conclude the property in the present case was an "occupied structure" at the time of the arson. R.C. 2909.01(C); 2909.02(A)(2) and (3).

{¶ 23} The evidence is therefore consistent with the jury's determination that appellant knowingly "cause[d] physical harm" by setting fire to an "occupied structure." R.C. 2909.02(A)(2). It is similarly consistent with the conclusion appellant knowingly created, "through the offer or acceptance of an agreement for hire or other consideration, a substantial risk of physical harm" to an "occupied structure." R.C. 2909.02(A)(3). Construing the evidence in a light most favorable to the state, we conclude a rational trier of fact could have reached these conclusions beyond a reasonable doubt. There was thus sufficient evidence to establish appellant committed both counts of aggravated arson, and the trial court properly overruled appellant's Crim.R. 29 motion for acquittal.

{¶ 24} The manifest weight of the evidence also supports appellant's convictions for aggravated arson. Because we defer to the jury's assessment of witness credibility, we refuse to second-guess the jury's assessments of the witnesses that led them to find appellant guilty of both counts of aggravated arson. *See Huber* at ¶ 32. The jury did not lose its way, nor did it create a manifest miscarriage of justice in finding appellant guilty of all counts. Accordingly, we overrule appellant's first and second assignments of error.

**B. Third Assignment of Error**

{¶ 25} Appellant's third assignment of error argues the trial court abused its discretion by admitting fire investigator Scott's report because it was more akin to a police report than an expert report.

{¶ 26} "A police report is hearsay unless it meets one of the exceptions enumerated in the Rules of Evidence." *Muncy v. Am. Select Ins. Co.*, 129 Ohio App.3d 1, 5 (10th Dist.1998), citing *Petti v. Perna*, 86 Ohio App.3d 508, 513 (3d Dist.1993). " 'Portions of a police report' " can, in certain circumstances, be admissible. *Id.*, quoting *Petti* at 513. For example, sections of a report containing "[t]he firsthand observations of the official making the report fall within the public records exception to the hearsay rule and are admissible." *Amoako-Okyere v. Church of the Messiah United Methodist Church*, 10th Dist. No. 14AP-441, 2015-Ohio-3841, ¶ 50, citing *Muncy* at 5, citing *Cincinnati Ins. Co. v. Volkswagen of Am., Inc.*, 41 Ohio App.3d 239, 242 (10th Dist.1987); *see* Evid.R. 803(8). Hearsay statements in a police report that lack "an independent source of admissibility," however, remain inadmissible at trial. *Id.*, citing Evid.R. 803(8) and *Cincinnati Ins. Co.* at 242.

{¶ 27} Here, although the trial court declared Scott to be an expert witness, appellant is correct in asserting the report written by Scott—a fire investigator and certified law enforcement officer—is in this case akin to a police report. This is especially true because Scott's report recommended the indictment of appellant. We thus consider the admissibility of Scott's report as we would a police report.

{¶ 28} " '[A] trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, [an appellate] court should be slow to interfere.' " *State v. Harris*, 10th Dist. No. 21AP-678, 2023-Ohio-3994, ¶ 60, quoting *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). " 'The Ohio Supreme Court has held that the erroneous admission of inadmissible hearsay that is cumulative to properly admitted testimony constitutes harmless error.' " *Id.*, quoting *Peffer v. Cleveland Clinic Found.*, 8th Dist. No. 94356, 2011-Ohio-450, ¶ 28, citing *State v. Williams*, 38 Ohio St.3d 346 (1988).

{¶ 29} In the present case, the great bulk of Scott's report documented his firsthand observations of the fire damage to the home in question. The state redacted the report prior to its admission into evidence in order to remove any potentially prejudicial hearsay. This report thus fell within the public records exception to the hearsay rule and was properly admitted by the trial court. Further, even if the report nevertheless contained some inadmissible hearsay after that redaction, Scott testified to the contents of the report at trial. Any potentially inadmissible hearsay contained in the report would have then been

cumulative to Scott's properly admitted testimony. If there was any error in the trial court's admission of his report, Scott's testimony rendered that potential error harmless and not prejudicial to appellant. The trial court did not abuse its discretion in admitting Scott's fire investigation report, nor was appellant materially prejudiced by the report's admission. Accordingly, we overrule appellant's third assignment of error.

## C. Fourth Assignment of Error

{¶ 30} Appellant's fourth assignment of error posits appellant was denied the effective assistance of counsel by his counsel's failure to consult with an independent expert and by his counsel's cross-examination of Scott, the state's expert witness.

{¶ 31} To prevail on a claim of ineffective assistance of counsel, a defendant "must satisfy a two-prong test." *State v. Stewart*, 10th Dist. No. 18AP-496, 2020-Ohio-1245, ¶ 11. First, a defendant "must demonstrate that his trial counsel's performance was deficient." *Id.*, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989). Second, a defendant "must establish that the deficient performance prejudiced his defense." *Id.*, citing *Strickland* at 687, and *Bradley* at 141-42.

{¶ 32} "The decision whether to call a witness is generally a matter of trial strategy." *State v. J.M.*, 10th Dist. No. 14AP-621, 2015-Ohio-5574, ¶ 32, citing *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 40. Appellant contends his counsel should have hired an expert witness to call into question the state's evidence that the fire was caused by arson. This case epitomizes the reason courts generally hesitate to second-guess the trial strategy of defense counsel's decision whether to call an independent expert. Here, the direct and circumstantial evidence that arson caused this fire was so overwhelming that appellant's trial counsel may have calculated that belaboring the origin of the fire would be detrimental to his client. For example, after the jury was shown video evidence of appellant lugging canisters of gasoline toward the home around the same time the fire began, in addition to the other multitudes of evidence linking appellant to this crime, it would have likely sounded extraordinary for defense counsel to insist the fire instead began by some natural cause. Thus, defense counsel may have employed a sound trial strategy by seeding doubt about whether the home could be considered an occupied structure under the law, rather than highlighting the state's strongest evidence by revisiting the fire's cause. For those reasons, "[t]he failure to call an expert witness and instead rely on cross-examination

does not constitute ineffective assistance of counsel." *Roush* at ¶ 40, citing *State v. Samatar*, 152 Ohio App.3d 311, 2003-Ohio-1639, ¶ 90, citing *State v. Hartman*, 93 Ohio St.3d 274, 299 (2001).

{¶ 33} Appellant also contends his trial counsel's cross-examination of Scott was unacceptably brief and did not do enough to cast doubt on appellant's role in starting the fire. " 'The extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel.' " *State v. Burns*, 10th Dist. No. 23AP-336, 2024-Ohio-1669, ¶ 39, quoting *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 146. "[A]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination." (Internal quotations omitted.) *Id.*, quoting *State v. Dorsey*, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 40. As already discussed, appellant's proposed trial strategy was debatable at best, and in all likelihood would have come off as absurd to a reasonable juror in light of the ample countervailing evidence. Appellant's trial counsel instead took the more plausible tact— seeking to establish the home was vacant and therefore not an "occupied structure" under the law. R.C. 2909.02(A)(2) and (3). Regardless, it is not our role to weigh the efficacy of any particular line of questioning on cross-examination. Appellant failed to show his counsel performed deficiently at trial, and he likewise failed to show any resulting prejudice to his defense. Accordingly, we overrule appellant's fourth assignment of error.

## IV. Conclusion

{¶ 34} Based on the foregoing, appellant's four assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

———————————